# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| CHARLENE RAIFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| NORTH CAROLINA CENTRAL | ) | |
| UNIVERSITY, through the | ) | |
| BOARD OF GOVERNORS OF THE | ) | 12CV548 |
| UNIVERSITY OF NORTH | ) | |
| CAROLINA and RAYMOND | ) | |
| PIERCE, LAUREN COLLINS, and | ) | |
| NICHELLE PERRY in their | ) | |
| individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Plaintiff's Motion for Leave to Amend the Complaint (Doc. #39), Defendants' Motion for Summary Judgment (Doc. #49), Plaintiff's Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (Doc. #65), and Plaintiff's Motion for Partial Summary Judgment (Doc. #51). The motions have been fully briefed and are ripe for review. For the reasons explained below, the Court denies Plaintiff's Motion for Leave to Amend the Complaint, grants in part and denies in part Defendants' Motion for Summary Judgment, denies Plaintiff's Motion for Leave to File Surreply to Defendants' Motion for

Summary Judgment, and denies Plaintiff's Motion for Partial Summary

Judgment.

I.

Plaintiff, Charlene Raiford, an African-American female who was forty

years of age when she was terminated on September 15, 2011, began her

employment with North Carolina Central University ("NCCU") in 2005 as an

Evening Reference Librarian in the Law Library of the NCCU School of Law.

(Pl. Dep. 9:2-13 Doc. #57 Ex. A; Pl. Aff. ¶ 2 Doc. #57 Ex. B.)  In 2008, she

accepted an offer of appointment as a Reference Librarian. (Doc. #49 Ex.

2.[1])  In the spring of 2010, while she was working as a Reference Librarian,

her working title changed to Student Services Librarian; she gained

additional responsibilities and received a raise.[2] (Doc. #49 Exs. 3-7.)  In July

2010, Ms. Raiford's duties changed and her working title became Head of

Reference Services,[3] a position she held until March 2011 when "all

management responsibilities for the reference department . . . revert[ed]

---

[1] Exhibit numbers for Docket Number 49 cited in this Opinion are numbers that
Defendants attributed to their exhibits in support of their Motion for Summary
Judgment.  When Defendants filed their supporting documents on CM/ECF,
CM/ECF assigned different numbers to the exhibits.

[2] At least by this time, Ms. Raiford's job position as a NCCU Reference Librarian
was associated with job position number 6090-1510-2311-178 ("1178"). (Doc.
#49 Ex. 4.)

[3] Ms. Raiford's job position number remained the same – position number 1178.
(Doc. #49 Ex. 10.)

2

back to Nichelle Perry[,]" the Assistant Director of the Law Library and Plaintiff's immediate supervisor. (Doc. #49 Ex. 27.)  Thereafter, Ms. Raiford continued working as a Reference Librarian[4] until her termination on September 15, 2011. (Doc. #49 Exs. 27, 33, 53.)

During the last nine months of her employment, Ms. Raiford filed three charges with the EEOC alleging discrimination, all of which were amended at least once.  On January 31, 2011, she filed a charge with the EEOC alleging age discrimination on January 24, 2011 ("Charge No. 2011-01171").[5] (Doc. #49 Ex. 65.[6])  On March 30, 2011, she filed a charge alleging race discrimination and retaliation for actions taking place between January 31, 2011 and March 30, 2011 ("Charge No. 2011-01764").[7] (Doc. #9 Ex. C.) On August 2, 2011, she filed a charge alleging retaliation from April 8, 2011 to July 12, 2011 for having filed Charge Nos. 2011-01171 and 2011-

---

[4] Although it appears Ms. Raiford was assigned as Reference Desk Coordinator/Reference Librarian after she was no longer Head of Reference Services (Doc. #58 Ex. Q), she described this position as "General Reference Librarian" (e.g., Doc. #49 Ex. 34), as will the Court.

[5] Ms. Raiford subsequently amended Charge No. 2011-01171 on February 8 claiming a continuing action of age discrimination and on March 31 added race discrimination. (Doc. #9 Ex. B.)

[6] Although Ms. Raiford has attached as Exhibit B to her Amended Complaint copies of amendments to Charge No. 2011-01171, she has not provided a copy of the initial Charge No. 2011-01171 filed on January 31, 2011. (See Doc. #9 Ex. B.)

[7] Ms. Raiford subsequently amended Charge No. 2011-01764 on August 2, 2011 adding age discrimination and changing the dates of discrimination to be from March 21, 2011 to March 30, 2011. (Doc. #9 Ex. C.)

3

01764 ("Charge No. 2011-02993").[8] (Doc. #9 Ex. D.)  Then, on November

29, 2011, after her termination, she filed a charge alleging retaliation from

September 10, 2011 to September 15, 2011 for having filed Charge Nos.

2011-01171, 2011-01764, and 2011-02993 ("Charge No. 2012-00313").

(Doc. #9 Ex. E.)  The EEOC issued a Notice of Rights for each of the

aforementioned charges. (Doc. #6 Att. 1 Exs. 1, 2; Doc. #9 Exs. F, G.)

On May 31, 2012, Ms. Raiford filed her Complaint in the instant

action; she amended it on September 21, 2012. (Docs. #1, 9.)  In her

Amended Complaint, she alleges race discrimination in violation of Title VII

of the Civil Rights Act of 1964 ("Title VII"), retaliation in violation of Title

VII, age discrimination in violation of the Age Discrimination in Employment

Act ("ADEA"), retaliation in violation of the ADEA, and a violation of 42

U.S.C. § 1983, specifically "Equal Protection Pursuant to the Fourteenth

Amendment and Section 1981[,]" based on race,[9] in Counts I-V,

respectively. (Doc. #9.)

---

[8] Ms. Raiford subsequently amended Charge No. 2011-02993 on December 2, 2011 and added details to her narrative in further support of her allegation of retaliation. (Doc. #9 Ex. D.)

[9] In Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 733, 109 S. Ct. 2702, 2722 (1989), the Court held that when a plaintiff sues a state actor, 42 U.S.C. § 1983 is the "exclusive federal remedy for violation of the rights guaranteed in § 1981." Although the Civil Rights Act of 1991 added subsection (c) to § 1981 ("The rights protected by this section are protected against impairment by nongovernment discrimination and impairment under color of State law."), the Fourth Circuit in Dennis v. County of Fairfax, 55 F.3d 151, 156 n. 1 (1995), stated:  "We do not

4

In its December 20, 2012, Memorandum Order, this Court dismissed Counts I and III in full as untimely and Count V in part as against NCCU. (Doc. #26.) Therefore, what remains before the Court are Counts II and IV alleging retaliation in violation of Title VII, 42 U.S.C. § 2000e, et seq., and the ADEA, 29 U.S.C. §§ 621-634, respectively, and Count V against the individual defendants alleging a violation of the Equal Protection Clause pursuant to 42 U.S.C. §§ 1981, 1983 on the basis of Ms. Raiford's race.

II.

First, the Court will address Ms. Raiford's "Motion for Leave to Amend the Complaint."[10] (Doc. #39). The Court entered a Scheduling Order on January 4, 2013, setting January 15, 2013 as the deadline for motions to amend and to add parties. (Doc. #27.) On April 30, 2013, Ms. Raiford filed her motion for leave to amend her Amended Complaint, citing Federal Rule of Civil Procedure 15. (Docs. #39, 40.) However, because she is actually seeking to modify the Scheduling Order, she must first present good cause for doing so.[11] See Fed. R. Civ. P. 16(b)(4).

_____

believe that this aspect of Jett was affected by the Civil Rights Act of 1991, which added subsection (c) to § 1981."

[10] Ms. Raiford has already amended her Complaint once. (See Docs. #1 & 9.) Therefore, she should be seeking to amend her Amended Complaint such that any proposed amended document would be entitled "Second Amended Complaint."

[11] Pursuant to the Court's Scheduling Order, possible delay of trial is another factor that the Court is to examine if a party seeks leave to amend after the January 15, 2013 deadline. (Doc. #27 § III.) As of the date of Ms. Raiford's motion, no trial

In her motion, Ms. Raiford neither recognizes her obligation under Rule 16 nor argues "good cause" in support of her motion. Instead, she focuses her argument entirely on Rule 15's parameters for amendment – no undue delay, no prejudice, no bad faith, and no futility. Nevertheless, Ms. Raiford's argument, the terms of the Scheduling Order[12], and the chronology of events[13] support a finding of good cause to amend the Scheduling Order as to the portion of her motion seeking to add Tammi Jackson, then-Associate Dean of NCCU School of Law, as a party. And, although Defendants have shown no undue delay, bad faith, or prejudice in either the filing of the motion on April 30, 2013 (as compared to immediately after receiving Defendants' February 25, 2013 discovery responses) or in adding Jackson

---

date had been set. As of the date of this Opinion, trial is set for the October 2015 term. (Doc. #71.) However, as explained below, other issues preclude amendment.

[12] The Scheduling Order noted that the parties agreed that motions to amend and add parties were to be filed by January 15, 2013 (Doc. #27 § III), the same day initial disclosures were due and written discovery could begin (id. § I).

[13] During the period for discovery, but after the deadline to move to amend and add parties, Defendants served their initial disclosures on January 22, 2013, their amended initial disclosures on February 7, 2013, and their responses to Ms. Raiford's first interrogatories on February 25, 2013. (Doc. #47 Exs. 1-3.) In these disclosures and responses, Defendants identified Jackson as, among other relevant things, someone with knowledge of the events detailed in the Amended Complaint and as being "involved in the decision to terminate" Ms. Raiford. (E.g., Doc. #47 Ex. 2 Resp. Nos. 3, 6, 8.) Ms. Raiford received this information about Jackson after the deadline to move to amend and add parties. See supra n. 12.

to the Amended Complaint[14], amending the Amended Complaint to add Jackson as a party would be futile for the reasons discussed in Section III.B.[15]

Furthermore, Ms. Raiford has not shown good cause for any of the other amendments she seeks – to add claims against Defendants Pierce, Collins, or Perry in their official capacities, "to more clearly identify the relief sought by Plaintiff,"[16] and "to reflect compliance with this Court's Orders dismissing certain counts in whole and one count in part." (Doc. #40 at 2.) Therefore, Ms. Raiford's Motion for Leave to Amend the Complaint is denied.

---

[14] Ms. Raiford "does not seek any additional discovery." (Doc. #40 p. 3.) Defendants have known of Jackson's involvement in and knowledge of issues alleged in the Amended Complaint (Doc. #47 Exs. 1-3); Defendants had the opportunity to examine deponents who testified about Jackson's role in Ms. Raiford's separation (e.g., Doc. #40 Exs. B, C); and Jackson submitted an Affidavit in support of Defendants' Motion for Summary Judgment, (Doc. #49 Att. 4).

[15] On a related note, although Ms. Raiford seeks to add Jackson as a party, she does not seek to add any substantive allegations about Jackson. Compare Doc. #40 Ex. 38 with Doc. #9. The only allegations in the Second Amended Complaint about Jackson are (1) "Ms. Raiford sought some assurance of her position and visited NCCU Law School's Dean Tammy Jackson's office and asked her for a copy of her personnel file on or about January 24, 2011" from the first Amended Complaint (Doc. #9 ¶ 58, Doc. #40 ¶ 58) and (2) the addition of identifying information about Jackson in the section entitled "The Parties[.]"

[16] None of the relief that Ms. Raiford seeks to add results from newly discovered evidence, and she has known since her initial disclosures that she is seeking back pay, front pay, compensatory damages, affirmative and equitable relief, attorney's fees, and other costs. (Doc. #53 Ex. A.) Nevertheless, if Ms. Raiford prevails, she is entitled to the relief afforded under the law and supported by the evidence.

7

III.

Defendants have moved for summary judgment on each of Ms. Raiford's remaining claims – retaliation in violation of Title VII and the ADEA (Counts II and IV, respectively) and a violation of § 1983 and the Equal Protection Clause on the basis of race (Count V).

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials of his pleading, but 'must come forward with specific facts showing that there is a genuine issue for trial.'" Emmett v. Johnson, 532 F3.d 291, 297 (4th Cir. 2008) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). Where the non-moving party has the burden of proof, as is the case here, the moving party is entitled to summary judgment if the non-moving party's evidence is insufficient to establish an essential element of her claim. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 325 (1986) (explaining that the moving party may "point[] out to the district court" an absence of evidence to support the nonmoving party's case).

8

When evaluating a motion for summary judgment, the court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000). Instead, "[t]he court must consider the evidence in the light most favorable to the non-moving party and draw all reasonable inferences from the facts in the non-movant's favor." Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 266 (4th Cir. 2001).

## A.

Title VII prohibits an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge . . . under this subchapter." 42 U.S.C. § 2000e-3(a). The ADEA provides nearly verbatim protection from an employer's discrimination that arises "because [an] individual . . . has opposed any practice made unlawful by this section, or because [an] individual . . . made a charge . . . under this chapter." 29 U.S.C. § 623(d).

To establish a prima facie claim of retaliation under Title VII or the ADEA,[17] Ms. Raiford must show that (1) she engaged in protected activity,

---

[17] Plaintiff alleges in her brief in opposition to Defendants' Motion for Summary Judgment that a February 16, 2011 "email is direct evidence that the Charge was part of the 'delayed response' that put the 'department in limbo[.]'" (Doc. #56

(2) her employer, Defendant NCCU[18], took an adverse employment action against her, and (3) a causal connection exists between her protected activity and the adverse employment action. See, e.g., Coleman v. Md. Ct. App., 626 F.3d 187, 190 (4th Cir. 2010) (Title VII); Laber v. Harvey, 438 F.3d 404, 432 (4th Cir. 2006) (ADEA).

If Ms. Raiford establishes a prima face case of retaliation, the burden of production shifts to NCCU to articulate a legitimate, non-discriminatory reason for the adverse employment actions at issue. Holland v. Wash. Homes, Inc., 487 F.3d 208, 218 (4th Cir. 2007) (applying burden-shifting to analyze claim for retaliation in violation of Title VII); Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004) (applying burden-shifting for allegations of discrimination in violation of the ADEA). If NCCU offers a legitimate, non-discriminatory reason for the adverse employment actions, Ms. Raiford then must show that NCCU's proffered reason is pretextual. Holland, 487 F.3d at 218; Mereish, 359 F.3d at 334. The plaintiff "bears the ultimate burden of

---

p. 4.) However, Plaintiff presents no other purported "direct evidence" and has proceeded against Defendants under the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). (Id. at 13-20.) Cf. Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013) ("Direct evidence encompasses conduct or statements that both (1) reflect directly the alleged discriminatory attitude, and (2) bear directly on the contested employment decision.") (internal quotation omitted).

[18] Ms. Raiford sued North Carolina Central University "through the Board of Governors of the University of North Carolina."

establishing that her protected activity 'was a but-for cause' of the alleged adverse action." Rome v. Dev. Alts., Inc., 587 F. App'x 38, 40 (4th Cir. Oct. 8, 2014) (unpublished) (Title VII case) (citing Univ. of Tex. Sw. Med. Ctr. v. Nassar, ___ U.S. ___, 133 S. Ct. 2517, 2534 (2013)); see also Mereish, 359 F.3d at 334; Tuttle v. McHugh, 457 F. App'x 234, 237 (4th Cir. Dec. 9, 2011) (unpublished) (stating, in the ADEA context, "[t]he plaintiff's burden to establish pretext merges with his ultimate burden of persuasion, which remains with the plaintiff throughout the McDonnell Douglas framework"). In other words, Ms. Raiford must show "that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." Nassar, 133 S. Ct. at 2533.

1.

Protected activity is described as oppositional or participatory. Compare 42 U.S.C. § 2000e-3(a) (". . . has opposed any practice made unlawful . . . ") and 29 U.S.C. § 623(d) (". . . has opposed any practice made unlawful . . . ") with 42 U.S.C. § 2000e-3(a)  (". . . has made a charge . . . under this subchapter") and 29 U.S.C. § 623(d) (". . . has made a charge . . . under this chapter"); see Laughlin v. Metro. Wash. Airports Auth., 149 F.3d 253, 259 (4th Cir. 1998).  "Opposition activity encompasses utilizing informal grievance procedures as well as staging

11

informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." Laughlin, 149 F.3d at 259. To be considered protected activity, opposition activity must respond to "employment actions actually unlawful under Title VII" or "employment actions an employee reasonably believes to be unlawful." EEOC v. Navy Fed. Credit Union, 424 F.3d 397, 406 (4th Cir. 2005). In addition, the court must "balance the purpose of the [Civil Rights] Act to protect persons engaging reasonably in activities opposing . . . discrimination, against Congress' equally manifest desire not to tie the hands of employers in the objective selection and control of personnel." Laughlin, 149 F.3d at 259.

On the other hand, and contrary to Defendants' argument (Doc. #50 at 9-10), there is no requirement that an employee's belief be reasonable when she takes part in participatory activity. See Glover v. S.C. Law Enforcement Div., 170 F.3d 411, 414-15 (4th Cir. 1999) (stating that "[r]eading a reasonableness test into section 704(a)'s participation clause would do violence to the text of that provision and would undermine the objectives of Title VII). Relevant to this case, participatory activity includes making a charge under Title VII and the ADEA. 42 U.S.C. § 2000e-3(a); 29 U.S.C. § 623(d).

12

Here, it is undisputed that Ms. Raiford filed charges with the EEOC in January, March, and August 2011, thereby engaging in participatory protected activity. (See Doc. #9 Exs. C, D & Doc. #49 Ex. 65.)  She also alleges that she opposed discrimination in informal ways (see, e.g., Pl.'s Suppl. Answer No. 1 to Defs.' First Interrogs. Doc. #58 Ex. M), the protection of which would require a determination as to the reasonableness of such activity.  However, because Ms. Raiford engaged in participatory protected activity, she has met the first prong of her prima facie case, even without considering her alleged oppositional activity.

2.

Ms. Raiford must next show that NCCU took adverse employment action against her, which she alleges took place from April 8 to July 12, 2011 and September 10 to September 15, 2011 (see Doc. #9 Exs. D, E).[19] In a case alleging retaliation, the adverse actions need not affect the terms or conditions of employment. Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 64, 126 S. Ct. 2405, 2412-13 (2006).  However, the employer's actions must be "materially adverse" to the employee, which

---

[19] While Ms. Raiford alleged retaliation in Charge No. 2011-01764, as amended, for actions between March 21 and March 30, 2011, this Court found the Complaint to be untimely as to that charge. (Doc. #26 at 5-6.)  Therefore, the only possible actionable conduct took place between April 8 and July 12, 2011 and September 10 and September 15, 2011, according to Charge Nos. 2011-02993 and 2012-00313, respectively.

13

"means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." Id. at 57, 126 S. Ct. at 2409.  Material adverse actions do not include "trivial harms[,]" "petty slights[,] or minor annoyances that often take place at work and that all employees experience." Id. at 68, 126 S. Ct. at 2415 (citing 1B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1993) for its notation that "'courts have held that personality conflicts at work that generate antipathy' and 'snubbing by supervisors and co-workers' are not actionable under § 704(a)").  Instead, the anti-retaliation provision of Title VII "seeks to prevent employer interference with unfettered access to Title VII's remedial mechanisms." Id., 126 S. Ct. at 2415 (internal quotation omitted). Nonetheless, "the significance of any given act of retaliation will often depend upon the particular circumstances.  Context matters." Id. at 69, 126 S. Ct. at 2415.  An employer's action that "may make little difference to many workers, but may matter enormously" to a plaintiff may be materially adverse action in such context. Id., 126 S. Ct. at 2415-16 (noting that "'an act that would be immaterial in some situations is material in others'") (citing Washington v. Ill. Dep't of Rev., 420 F.3d 658, 661, 662 (7th Cir. 2005) & 2 EEOC 1998 Manual § 8, p. 8-14).

14

a.

It is undisputed that NCCU terminated Ms. Raiford's employment on September 15, 2011 (e.g., Doc. #9 Ex. E), an action that she claims was in retaliation for her earlier filing of charges of discrimination (id.). Discharging an employee could undoubtedly dissuade a reasonable worker from making a charge of discrimination.

Not only is Ms. Raiford's termination sufficient to meet the second prong of her prima facie case, but so, too, are other actions, viewed in the light most favorable to her, that Defendants allegedly took against her in July and September 2011[20] (see id. & Doc. #9 Ex. D). The annual Performance Review Form applicable to Ms. Raiford in 2011 instructs that University policy requires that each applicable employee receives a written annual performance evaluation "covering the immediately preceding July 1[, 2010] through June 30[, 2011]."[21] (Doc. #58 Ex. Q.) In Ms. Raiford's case, that time period would include her positions as Student Services Reference Librarian which she held prior to the filing of any EEOC

---

[20] Ms. Raiford alleges a number of retaliatory acts in April, July, and September 2011, some, all, or none of which may be considered adverse employment actions. (See, e.g., Pl.'s Dep. 156-57, 165-68, 170-72, 179-80; Pl.'s Aff. ¶ 235.) However, this Opinion only discusses several of those alleged acts that are clearly adverse employment actions, as they are sufficient to support the second prong of Ms. Raiford's prima facie case.

[21] There are exceptions, but none applies to Ms. Raiford. (See Doc. #49 Ex. 32.)

charges, Head of Reference Services from which she was removed in March 2011, and General Reference Librarian which she held until her termination. (Doc. #58 Ex. Q; Doc. #57 Ex. B ¶ 149; Doc. #49 Ex. 27.)

However, on June 30, 2011, Perry completed Ms. Raiford's evaluation covering the period August 15, 2010 to July 30, 2011 and only noted Ms. Raiford's role as Head of Reference Services. (Doc. #49 Ex. 32.)  As part of this annual performance review, Ms. Raiford received an "Unsatisfactory" rating for her communication skills, collaboration and teamwork, supervision, and leadership. (Doc. #49 Ex. 32.)  She also received a rating of "Needs Improvement" for organization and task management. (Id.)  Her overall rating was "Unsatisfactory." (Id.)  Because this initial performance review only reviewed Ms. Raiford's role as Head of Reference, she requested that the review be revised to reflect her additional roles as Student Services/Reference Librarian and General Reference Librarian during the year. (Doc. #49 Ex. 34.)  Perry revised the performance review as requested and, as a result, added narrative comments for each category. (Doc. #49 Exs. 36-37; Doc. #58 Ex. Q.)  Ms. Raiford's categorical ratings, though, did not change. (Compare Doc. #49 Ex. 32 with Doc. #58 Ex. Q.)

As a result of Ms. Raiford's unsatisfactory ratings, she also received a Performance Improvement Plan, identifying her management deficiencies,

providing the corrective action of suspending her management duties and assigning her new duties to coordinate reference desk services, and scheduling a follow-up discussion. (Doc. #58 Ex. Q.)  A condition of the Performance Improvement Plan was regular review of her progress, which led to a September 8, 2011 evaluation review noting, in part, that Ms. Raiford was subject to termination if her "failure to collaborate . . . negatively impacts instruction[.]" (Doc. #49 Ex. 52.)

Receipt of a negative performance review that necessitated a Performance Improvement Plan subjecting Ms. Raiford to regular progress reviews and potential termination could dissuade a reasonable employee from filing a charge of discrimination. See James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 377 (4th Cir. 2004) (noting, in the race discrimination context, that "a poor performance evaluation is actionable only where the employer subsequently uses the evaluation as a basis to detrimentally alter the terms or conditions of the recipient's employment") (internal citation omitted). Cf. McNeill v. Bd. of Govs. of the Univ. of N.C., 837 F. Supp. 2d 540, 544 (M.D.N.C. 2011) (after citing James for the proposition that "a negative performance evaluation alone was not sufficient to establish a material adverse action," states that "Burlington clearly changed the standard against which evidence is to be evaluated . . . . Now, the

significance of any given act of retaliation will . . . depend upon the particular circumstances") (internal quotation and citation omitted).  In sum, Ms. Raiford has made a sufficient showing of the second prong of her prima facie case.

b.

In addition to the adverse employment actions above, it also appears as though Ms. Raiford has alleged retaliatory harassment as part of her retaliation claim. (See, e.g., Doc. #9 ¶¶ 79, 111 & Ex. E (checking "Retaliation" and beginning narrative with "Since August 2011, until September 15, 2011, I have been subjected to a hostile work environment . . . .").)  "Retaliatory harassment can constitute adverse employment action[.]" Von Gunten v. Maryland, 243 F.3d 858, 869 (4th Cir. 2001) abrogated on other grounds by Burlington, 548 U.S. 53, 126 S. Ct. 2405. The conduct must be "'severe or pervasive enough' to create 'an environment that a reasonable person would find hostile or abusive.'" Id. at 870 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)).  To determine if the work environment is hostile or abusive, courts look at "all the circumstances" which "may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably

18

interferes with an employee's work performance." Harris, 510 U.S. at 23, 114 S. Ct. at 371. In addition, the employee must subjectively believe the environment to be abusive. Id. at 21-22, 114 S. Ct. at 370. The Fourth Circuit has "recognized that plaintiffs must clear a high bar in order to satisfy the severe or pervasive test." EEOC v. Sunbelt Rentals, Inc., 521 F.3d 306, 315 (4th Cir. 2008).

Ms. Raiford alleges in Charge No. 2012-00313 that retaliation took place from September 10 to September 15, 2011, but that she was subjected to a hostile work environment from August to September 15, 2011. (Doc. #9 Ex. E.) Even taking into account Defendants' alleged retaliatory conduct as early as April 2011, the earliest possible retaliatory conduct before the Court, supra 13 n. 19, the evidence does not show that Defendants' conduct was severe or pervasive enough that a reasonable person would find the work environment hostile or abusive. In either March or April 2011, there were issues with Perry claiming that she could not see Ms. Raiford's electronic calendar entries on her own calendar. (Am. Compl. ¶ 79; Pl. Dep. 151:19-153:15.) In May, Perry allegedly "started cursing and yelling" at Ms. Raiford "about a chair" and ordered her to remove the chair from her office. (Am. Compl. ¶ 86; Pl. Dep. 167:11-68:13.) In July, Ms. Raiford received her unsatisfactory performance evaluation. (Doc. #58 Ex.

Q.)  In August, there were issues with her unsuccessful hiring of a student library worker and development of a search term assignment. (Pl. Aff. ¶¶ 184-92, 202-20; Doc. #49 Exs. 41-50.)  In September, after Perry reassigned the search term assignment to Adrienne DeWitt, DeWitt contacted Ms. Raiford on a Sunday requesting a copy of the associated PowerPoint presentation. (Pl. Aff. ¶¶ 230-31; Doc. #49 Ex. 51.)  Perry told Ms. Raiford that the PowerPoint was a separate assignment and required her to provide it by Monday at 10:00am, even though Perry was aware that Ms. Raiford was not scheduled to work until 12:00p.m. that Monday. (Pl. Aff. ¶¶ 233-34.)  There were also issues with Perry's request to record the librarians, including Ms. Raiford, teaching to provide feedback. (Id. ¶ 222.)  Ms. Raiford objected until she and her attorney reviewed the policy for doing so, and, although NCCU directed Ms. Raiford to a faculty handbook, her questions were not addressed. (Id. ¶¶ 223, 226-229.)  Several days later, while teaching, she noticed a message on her computer screen that recording had been interrupted. (Id. ¶ 235.)  Brian Schriener told her that he had accidentally recorded her class in preparation for an afternoon class that Ms. Raiford claims did not exist. (Id.)  Finally, she was terminated on September 15, 2011. (E.g., id. ¶ 236.)

20

Although Ms. Raiford believes this conduct created a hostile and abusive environment, the evidence does not reveal conduct severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive. While the evidence does suggest that Defendants' actions interfered with Ms. Raiford's work performance, their conduct cannot be described as severe, physically threatening, or offensive. Nonetheless, because the evidence does show other adverse employment actions, as explained above, Ms. Raiford has met the second prong of her prima facie case.

3.

Next, Ms. Raiford must show a causal connection exists between her protected activity and an adverse employment action. In 2013, the Supreme Court determined that "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." Nassar, 133 S. Ct. at 2534. Since Nassar, circuit courts and courts within the Fourth Circuit have been divided over the application of Nassar, if at all, to the causation prong of the prima facie case. Compare, e.g., EEOC v. Ford Motor Co., No. 12-2484, 2015 WL 1600305 at *14 (6th Cir. Apr. 10, 2015) with Butterworth v. Lab. Corp. of Am. Holdings, 581 F. App'x 813, 817 (11th Cir. 2014); see

21

also Adelfia v. Davita, Inc., No. 1:13CV940, 2015 WL 268983, *8 (M.D.N.C. Jan. 20, 2015) (noting that the Fourth Circuit had not yet addressed Nassar in a published opinion and the district courts did not agree on Nassar's application). However, in its first published opinion on the issue, the Fourth Circuit recently held that Nassar has no "bearing on the causation prong of the prima facie case." Foster v. Univ. of Md. - E. Shore, ___ F.3d ___, No. 14-1073, 2015 WL 2405266, *5 (May 21, 2015). Were the court to hold otherwise "and apply[] the ultimate causation standard at the prima facie stage[,] [that] would be tantamount to eliminating the McDonnell Douglas framework in retaliation cases . . . ." Id.

Viewing the evidence in the light most favorable to Ms. Raiford, she has met her burden of showing causation. She filed her first two charges with the EEOC on January 31, 2011 (Charge No. 2011-01171) and March 30, 2011 (Charge No. 2011-01764). She alleges that from April 8 to July 12, 2011, Defendants retaliated against her for filing those charges. Specifically, in July, she received an unsatisfactory rating in her annual review, which required a Performance Improvement Plan, which subjected her to additional reviews and possible termination. (Supra p. 16-17.) Perry, who evaluated Ms. Raiford's performance as unsatisfactory, "was aware of Plaintiff's series of Charges of Discrimination she filed with the EEOC."

22

(Perry Aff. ¶ 66 Doc. #49; <u>see also</u> Collins Aff. ¶ 62 Doc. #49 (stating the same).)

The following month, in August, Ms. Raiford filed her third charge with the EEOC (Charge No. 2011-02993). She alleges that, as a result, Defendants retaliated against her from September 10 to September 15, 2011. Specifically, on September 15, 2011, she was terminated. In addition to Perry and Lauren Collins (then-Director of NCCU Law Library), both Raymond Pierce (then-Dean of NCCU School of Law) and Jackson – at least three of whom were decision-makers in Ms. Raiford's termination – attested that they were "aware of Plaintiff's series of Charges of Discrimination she filed with the EEOC." (Pierce Aff. ¶ 15; Doc. #49 Jackson Aff. ¶ 37 Doc. #49.) Pierce testified that Collins told him that Ms. Raiford should be terminated because she was "[u]ncooperative, disruptive, disagreeable, problematic . . . [m]ostly uncooperative." (Pierce Dep. 58:12-24 Doc. #57 Ex. F.) Pierce described Ms. Raiford as "just the type of employee, type of person that didn't work well with others." (<u>Id.</u> 59:12-13.) The evidence of temporal proximity between Ms. Raiford's protected activity and Defendants' adverse employment actions[22] and Defendants' knowledge of Plaintiff's protected activity, as well as the inconsistent explanations

---

[22] <u>See</u> discussion <u>infra</u> p. 26-30.

given by the individuals involved with the decision to terminate Ms.

Raiford[23], tend to show causation. See Foster, 2015 WL 2405266, *6

(explaining that the employer's reason for termination suggested that the

plaintiff was terminated for complaining about harassment and that evidence

of temporal proximity tended to show causation).

4.

Because Ms. Raiford has met her burden of establishing a prima facie

case, the burden shifts to NCCU to show a legitimate, non-retaliatory reason

for the adverse employment actions at issue.  NCCU "need not persuade the

court that it was actually motivated by the proffered reasons[,]" as it is

"sufficient if [its] evidence raises a genuine issue of fact as to whether it

discriminated against [P]laintiff." Tx. Dep't of Cmty. Affairs v. Burdine, 450

U.S. 248, 254, 101 S. Ct. 1089 (1981).

NCCU has proffered admissible evidence of legitimate, non-retaliatory

reasons for Ms. Raiford's unsatisfactory review in 2011. (See, e.g., Doc.

#58 Ex. Q (providing detailed comments for each evaluated category

including poor communication with reference team and management,

inability to work as a team with others, failure to provide guidance to refusal

to provide support for colleagues).)  Although Defendants have been

---

[23] See discussion infra 30-35.

inconsistent as to why Ms. Raiford was terminated, NCCU has proffered evidence of performance issues such as insubordination and lack of cooperation with colleagues. (See, e.g., Perry Aff. ¶¶ 54, 55; Jackson Aff. ¶¶ 24, 27-28 (noting Ms. Raiford's insubordination when she failed to make directed modifications to a project over an extended period of time, continued and extensive issues with performance, and inability or unwillingness to work with colleagues).)  Therefore, NCCU has met its burden.

5.

Because NCCU has met its burden of articulating legitimate, non-retaliatory reasons for adverse employment actions it took against Ms. Raiford, "the presumption of retaliation falls, and [P]laintiff bears the ultimate burden of proving that the defendant's non-retaliatory reason for the adverse employment action was pretextual[,]" Navy Fed. Credit Union, 424 F.3d at 407, "by showing both that the reason was false and that discrimination was the real reason for the challenged conduct[,]" Smith v. First Union Nat'l Bank, 202 F.3d 234, 248 (4th Cir. 2000) (internal quotation omitted).  In Foster, the Fourth Circuit concluded that "Nassar's but-for causation standard . . . does not demand anything beyond what is already required by the McDonnell Douglas 'real reason' standard." 2015 WL

2405266, *6. See also id. ("[T]he McDonnell Douglas framework has long

demanded proof at the pretext stage that retaliation was a but-for causation

of a challenged adverse employment action.").

When viewing the evidence in the light most favorable to Ms. Raiford,

there is sufficient evidence from which a reasonable fact-finder could

determine that Ms. Raiford has met her burden that but for her protected

activity, she would not have received an unsatisfactory performance review

and would not have been terminated.

a.

Prior to filing any charges with the EEOC, Ms. Raiford received overall

ratings of "Good" and "Very Good" in her 2008-2009 and 2009-2010

annual performance reviews, respectively. (Pl.'s Dep. 65:5-9; Doc. #58 Ex.

K.) An overall rating of "Very Good" was defined as exceeding acceptable

expectations because the employee "routinely exhibits mastery of the job

and is known for the quality of results, professionalism, and leadership of his

or her respective area." (Doc. #58 Ex. K.) She also received "Very Good"

ratings in 2010 on the specific skills entitled "Conduct Training Sessions,"

"Teach in Legal Research and Writing Program," and "Provide Reference and

Research Assistance." (Id.) Perry complimented Ms. Raiford on, among

other things, her "quality work[,]" "coordinating all aspects of the workshop

26

and seminar series[,]" "support[] of her colleagues in a number of ways[,]" being "a team player and often off[erring to] cover the reference desk in the event someone is ill or running late [and] shar[ing] her ideas with her colleagues and appear[ing] open to receiving input regarding projects[,]" "initiative by taking on projects and assisting with projects when possible[,]" and "willing[ness] to change with the new administration and . . . accept[ance of] changes with an open mind." (Id.)

In an August 2010 e-mail to the Reference Department, Collins complimented the librarians and staff, noted that the "reference department has quickly become a cohesive team," and expressed happiness "that all of [the e-mail recipients] have decided to join [the Law Library] (or stay with us in Charlene's case) to make the NCCU Law Library one of the best." (Doc. #59 Ex. W.)

Things began to change after Ms. Raiford filed her first charge with the EEOC in January 2011. In March 2011, a professor e-mailed Collins, then-Associate Dean Wendy Scott, and Pierce a "Special Thank You[,]" noting that she "could not have [submitted her third article of the semester] without Charlene Raiford[] . . . [who] took time out to help me with short notice and gave valuable suggestions and research assistance for the article. . . . Her attitude is refreshing and I value her presence in the library." (Doc.

27

#59 Ex. Z.) Scott replied, "Charlene is wonderful." (Id.) Pierce forwarded Scott's reply to Collins with "?" as his message, to which Collins replied, "I will talk with Wendy when she returns or mention it at Direct Reports, with your permission." (Id.) Pierce responded, "Please do." (Id.) Separately, Collins forwarded Scott's e-mail to Perry, stating "Whatever." (Doc. #59 Ex. AA.)

In July 2011, as part of Ms. Raiford's 2010-2011 annual performance review, after having filed two charges with the EEOC in January and March 2011, she received an overall rating of "Unsatisfactory" and a specific rating of "Unsatisfactory" for communication skills, collaboration and teamwork, supervision, and leadership. (Doc. #49 Exs. 32, 37; Doc #58 Ex. Q.) However, just the previous year, Perry had complimented Ms. Raiford on these same or similar skills – coordinating projects, supporting colleagues, working as a team player, taking initiative – and assigned her an overall rating of "Very Good" recognizing her professionalism and leadership. (Doc. #58 Ex. K.) When Collins was asked if she had "ever raise[d] any concern about [Ms. Raiford's] abilities to work with her colleagues in writing" before Ms. Raiford filed a charge with the EEOC, Collins responded, "Not that I recall." (Collins Dep. 106:17-20 Doc. #57 Ex. E.) Ms. Raiford maintains that, despite having weekly meetings with Perry concerning the Reference

Department, "never in any of these meetings did [Perry] suggest that she had a problem with how I was conducting my management responsibilities or interacting with my subordinates." (Pl.'s Aff. ¶ 40.) When viewed in the light most favorable to Ms. Raiford, this evidence supports an inference that NCCU's reasons for Plaintiff's unsatisfactory performance review were false and discriminatory and that but for Plaintiff's filing of charges with the EEOC, she would not have received an unsatisfactory performance review and its associated consequences.

b.

With respect to her termination, Ms. Raiford has presented evidence that tends to show that but for her protected activity, she would not have been terminated. In early August 2011, she filed her third charge with the EEOC. In late August, Perry began working on paperwork about Ms. Raiford's performance as part of Ms. Raiford's Performance Improvement Plan which "evolved into what ultimately happened[,]" but Collins does not believe Ms. Raiford ever received those documents. (Collins Dep. 147:20-148:5.)

According to Collins, when she went on vacation during the second week in September, there were two options with respect to Ms. Raiford's employment – terminating her or having another evaluation. (Id. at 145: 6-

29

21.)  Jackson spoke to Collins during her vacation, and Collins "walked away with . . . an understanding that there was a movement towards termination[.]" (Id. 143: 12-20.)  On September 9, Collins e-mailed Scott requesting permission to record Ms. Raiford's class, despite her refusal to consent until her attorney reviewed the consent form. (Doc. #59 Ex. Y.) The day before she was terminated, Ms. Raiford e-mailed Scott to report "an incident in [her] legal research class today whereby [her] class was interrupted by a teamviewer recording" and to request the recording policy that Scott mentioned to her the prior week. (Doc. #60 Ex. AE.)  On September 15, in lieu of a review pursuant to her Performance Improvement Plan, Ms. Raiford attended a meeting at which she was terminated. (Doc. #57 Ex. B ¶ 236.)

Not only do the events leading up to her termination support but-for causation, but additional circumstances do, too.  For example, the reasons, or lack thereof, for Ms. Raiford's termination varied.  She was not given a reason for her termination.[24] (Perry 30(b)(6) Dep. 101:4-6 Doc. #57 Ex. C.)

---

[24] Ms. Raiford's at-will employment was terminated pursuant to Section 3.A. "Discontinuation of Appointment" of Employment Policies for EPA Non-Faculty. (Doc. #49 Exs. 53, 62.)  According to Defendants, this policy does not require that Ms. Raiford be provided any reason for her termination. (See, e.g., Perry Dep. 131:25-132:6.)  Ms. Raiford conceded the point, as well. (Doc. #49 Ex. 54.)

When Perry testified in her personal capacity as Ms. Raiford's supervisor, her

explanation for Ms. Raiford's termination was as follows:

> Q. Was Ms. Raiford discontinued for performance reasons?
>
> A. Ms. Raiford was discontinued just under 3A, not based on discontinuance with severance.
>
> Q. And my question is, was she discontinued for performance reasons?
>
> A. We didn't specifically give her performance reasons.
>
> Q. And so there wasn't a specific determination of performance reasons?
>
> A. Not to my knowledge, no.
>
> Q. Okay. And so at that time then, you didn't identify performance reasons, correct?
>
> A. Well, I think that's been established that we pulled together and identified some reasons why we were considering it, but I don't – I think we're getting confused. I'm getting this confused as to what it was based on or –
>
> Q. Sure. My question is just a simple question, was the discontinuation based on performance reasons?
>
> A. The discontinuation I'm going to state no.
>
> Q. So performance reasons did not contribute to the discontinuance?
>
> A. Well, I mean, okay, then, yes. Okay, of the totality of the circumstances. I'm not really sure. I guess I'm getting confused with the substance of how it is, because it was based on, yeah.
>
> Q. And there was in fact no reason besides the performance reason for the layoff of Ms. Raiford, correct?
>
> A. It would be based on her performance, right.
>
> . . .
>
> Q. My question is, did Central ever identify any specific reason for Ms. Raiford's layoff?

A. I'm not sure that there's – okay, I'm trying to find the question in there.

. . .

Q. So my question is just overall, in overall terms, did Central ever say and identify these are the reasons leading to the termination?

A. I don't think – I think those are the reasons, that's some, but I don't think that's dispositive. Maybe that's more of my point.

(Perry Dep. 127:15-128:22, 131:4-131:22 Doc. #57 Ex. D.)

When Perry testified on behalf of NCCU as one of its Rule 30(b)(6) witnesses, she testified that "part of the reasons for Ms. Raiford's separation related to a series or [sic] continued performance issues" and that she was "discontinued for performance reasons[.]" (Perry 30(b)(6) Dep. 99:12-16, 100:9-12.) However, after confirming that Ms. Raiford was not given a reason for her termination and was "discontinued because she was an at will employee[,]" Perry was asked, "if Ms. Raiford would have applied for a job a month after her termination and made a statement to that employer that she was not terminated for performance reasons, would that statement be inaccurate?" (Id. 101:4-11.) Perry responded, "she could very well state that." (Id. 101:13-20.)

On the other hand, as previously noted, Pierce testified that Collins told him Ms. Raiford should be terminated because she was "[u]ncooperative, disruptive, disagreeable, problematic . . . [m]ostly

32

uncooperative." (Pierce Dep. 58:12-24.)  Pierce described Ms. Raiford as

"just the type of employee, type of person that didn't work well with

others" and that "she just fell into the guidelines in that category of people

that this university in the UNC system, state policies identified as to be

terminated." (Id. 59:4-16.)  However, in its position statement to the EEOC

in response to Ms. Raiford's charge after she was terminated,[25] NCCU

represented that "Ms. Raiford's employment was not discontinued for

performance reasons." (Perry Dep. 127:4-9, 129:7-18; see also id. 130:1-4

"Q.  So Central told the EEOC that her discontinuation was not for

performance reasons, correct? A.  Right.")

Just as Defendants' reasons for Ms. Raiford's termination have varied,

so, too, have their explanations of who decided to terminate her.  In its

position statement to the EEOC in response to Ms. Raiford's charge filed

after her termination,[26] NCCU listed only Pierce as the decision-maker. (Perry

Dep. 132:13-133:11.)  In Perry's deposition as one of NCCU's Rule 30(b)(6)

---

[25] Ms. Raiford's counsel described Deposition Exhibit 150 during Perry's deposition as "letters that Ms. Murphy [counsel for NCCU] submitted to the EEOC on behalf of NCCU." (Perry Dep. 127:4-9.)  Although Ms. Raiford did not submit the particular "letter" her counsel quoted in Perry's deposition, given the context of the questions and testimony and the position statement in Defendants' Exhibit T (Doc. #58 Ex. T), it is likely that her counsel was referring to NCCU's position statements provided to the EEOC in response to Ms. Raiford's charges of discrimination.

[26] See id.

33

witnesses, Perry testified that she, Jackson, Collins, and Pierce made the decision to terminate Ms. Raiford. (Perry 30(b)(6) Dep. 85:19-23.) Pierce testified that he, Jackson, and Collins were the only decision-makers. (Pierce Dep. 73:20-25.) Collins testified that she "did not make the decision that Ms. Raiford should be separated[,]" but that "[t]here were times when there were discussions about separating Ms. Raiford" in which she was "involved[.]" (Collins Dep. 139:1-7.)

Similarly, the timing of the decision to terminate Ms. Raiford is unclear. Collins testified that "a culmination of events" led to Ms. Raiford's termination. (Id. 140:22-141:2.) She then stated that "[t]here was a point when the process required for termination began" which "would have been after September 8 [when] I left on vacation" and that "it was an option when I left, but then it wasn't at a point of no return, I would guess." (Id. 141:15-25.) While on vacation, Collins spoke with Jackson and "walked away with . . . an understanding that there was a movement towards termination[.]" (Id. 143:12-20.) But, Collins did not "recall it being definite . . . . [T]hat was [sic] the tide was turning that way, but I can't tell you at what point it became definite." (Id. 144:10-15.) On the other hand, Pierce testified that Jackson and Collins met with him before Collins went on vacation "to inform me that Charlene was going to be terminated[.]" (Pierce

34

Dep. 61:15-22.)  Pierce understood that Collins had at that point made the decision to terminate Ms. Raiford. (Id. 62:7-10.)  "[T]hen about a week or so later, Tammi brought me this [termination letter] and I signed it."[27]  (Id. 62:5-6.)

Although each of these inconsistencies and varied explanations individually may be insufficient to meet Ms. Raiford's burden, taken together, she has presented evidence from which a fact-finder could reasonably determine that Defendants' reasons for her termination were false and that they were discriminatory.  In other words, but-for Plaintiff's engaging in protected activity, she would not have been terminated.

4.

Ms. Raiford has provided sufficient evidence to establish her prima facie case of retaliation, which NCCU rebutted with legitimate, non-discriminatory explanations.  However, Ms. Raiford has proffered evidence that but-for her protected activity, NCCU would not have taken adverse employment actions against her.  As a result, the Court denies summary judgment for Ms. Raiford's claims of retaliation in violation of Title VII and the ADEA, respectively.

---

[27] On the other hand, Perry testified that she "hand[ed] [Pierce] the letter to be signed." (Perry Dep. 68:21-25.)

B.

Next, the individual defendants[28] have moved for summary judgment

on Ms. Raiford's claim of race discrimination in violation of 42 U.S.C. §

1983. She alleges that, as an African-American, she "was denied equal

protection under color of law on the basis of her race[.]" (Am. Compl. ¶

141.) She further alleges that Pierce, Collins, and Perry denied her equal

protection on the basis of her race when she "was threatened, demoted,

subject to heightened scrutiny, increased surveillance, exclusion and

isolation, changes in job duties, a negative evaluation, [and] threats, and

was ultimately terminated[.]" (Id. ¶¶ 141, 143.) Because Ms. Raiford

incorporated by reference all of her factual allegations, which include

allegations of retaliatory conduct, she is understood to have alleged both

status-based race discrimination and race retaliation in violation of § 1983.[29]

Defendants argue that, in Ms. Raiford's response to Defendants'

motion for summary judgment, "Plaintiff failed to address her § 1983 claims

for race discrimination against the individual Defendants and effectively

---

[28] This Court previously dismissed the portion of Count V against NCCU alleging race discrimination in violation of 42 U.S.C. § 1983. (Doc. #26.)

[29] Unlike the ADEA, "the legislative history of Title VII reveals that Congress did not intend the comprehensive statutory scheme of Title VII to operate to the exclusion of Fourteenth Amendment claims of racial discrimination brought by public sector employees." Zombro v. Baltimore City Police Dep't, 868 F.2d 1364, 1370 n. 5 (4th Cir. 1989).

36

abandoned those claims." (Doc. #63 at 1-2.) It is true that Ms. Raiford's

argument and presentation of evidence in opposition to Defendants' motion

concern retaliation only. (See Doc. #56 at 1-20.) Defendants correctly cite

Local Rule 56.1(e) for the proposition that "[t]he failure to file a response

may cause the Court to find that the motion is uncontested." See also, e.g.,

Moser v. MCC Outdoor, LLC, 256 F. App'x 634, 643 (4th Cir. Dec. 5,

2007) (unpublished) (finding district court's application of its local rules

reasonable and affirming district court's dismissal of two claims pursuant to

M.D.N.C. Local Rules 7.3(k) and 56.1(e) because the motion for summary

judgment on those claims was uncontested and defendants' uncontested

argument appeared to be reasonable). Cf. Custer v. Pan Am. Life Ins. Co.,

12 F.3d 410, 416 (4th Cir. 1993) ("Although the failure of a party to

respond to a summary judgment motion may leave uncontroverted those

facts established by the motion, the moving party must still show that the

uncontroverted facts entitled the party to a judgment as a matter of law.")

(internal quotations omitted); Holt v. U.S., No. 1:09cv122, 2010 WL

1286671, *2 (M.D.N.C. Mar. 29, 2010) (unpublished) (considering the

merits of the motion for summary judgment even though plaintiff failed to

respond and defendant's facts are uncontested and citing Custer). Here,

Ms. Raiford's omission of any evidence in opposition to Defendants' motion

37

for summary judgment on the portion of her § 1983 claim alleging status-based race discrimination leaves Defendants' facts in support of that part of the motion uncontroverted.  Nonetheless, the Court must still determine if, even in light of the uncontroverted facts, the individual defendants are entitled to summary judgment on the portion of Ms. Raiford's § 1983 claim alleging status-based race discrimination – and, of course, on the portion of the § 1983 claim alleging race retaliation for which Plaintiff did present evidence in response to Defendants' motion.

1.

Just as it applies in Title VII cases, the McDonnell Douglas framework applies in § 1983 cases in which a plaintiff alleges no direct evidence of discrimination, as is the case here. See, e.g., Gairola v. Va. Dep't of Gen. Servs., 753 F.2d 1281, 1286, 87 (4th Cir. 1985).  In addition, the elements of a prima facie case for discrimination under § 1983 are the same as those for a discrimination claim pursuant to Title VII. Id. at 1285.  Ms. Raiford must, therefore, establish that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) at the time of the adverse employment action, she was performing at a level that met [Defendants'] legitimate job expectations; and (4) the adverse employment action occurred 'under circumstances which give rise to an inference of unlawful

38

discrimination.'" Jenkins v. Trs. of Sandhills Cmty. Coll., 259 F. Supp. 2d 432, 443 (M.D.N.C. 2003) (quoting EEOC v. Sears Roebuck & Co., 243 F.3d 846, 851 n. 2 (4th Cir. 2001)) aff'd, 80 F. App'x 819 (4th Cir. 2003) (unpublished per curiam opinion).  "An adverse employment action is a discriminatory act that 'adversely affect[s] the terms, conditions, or benefits of the plaintiff's employment.'" Holland v. Washington Homes, Inc., 487 F.3d 208, 219 (quoting James, 368 F.3d at 375).  The "typical requirements for a showing of an 'adverse employment action'" are "discharge, demotion, decrease in pay or benefits, loss of job title or supervisory responsibility, or reduced opportunities for promotion[.]" Boone v. Goldin, 178 F.3d 253, 253 (4th Cir. 1999).  "Ultimately, the establishment of a prima facie case of employment discrimination requires proof by a preponderance of the evidence that the plaintiff was not promoted or dismissed under conditions which, more likely than not, were based upon impermissible racial considerations." Gairola, 753 F.2d at 1286 (internal quotation omitted).

If Ms. Raiford meets her prima facie burden, the burden shifts to the individual defendants to articulate legitimate reasons for their actions. Id. at 1287.  If the individual defendants articulate legitimate reasons for their actions, Ms. Raiford must meet her ultimate burden of showing that the

39

individual defendants' explanations are a pretext for unlawful discrimination.
Id.

Here, regardless of the particular alleged action of the individual defendants, Ms. Raiford has not met her burden of establishing a prima facie case. Even assuming she could meet the first three prongs of the prima facie case,[30] she was not replaced by someone outside the protected class at issue and cannot show that the alleged adverse employment actions were taken under circumstances giving rise to race discrimination. She alleged that after she became Head of Reference Services, Patricia Dickerson, Caucasian,[31] replaced her as Student Services Reference Librarian.[32] (Pl. Dep. 122:7-12, 124:14-15.) However, Dickerson did not replace Ms. Raiford. Ms. Raiford had voluntarily agreed to take on additional

---

[30] Ms. Raiford's allegation that Defendants' reviews of her performance are retaliatory makes it difficult to determine whether or not her performance met Defendants' expectations.

[31] In Charge No. 2011-01171, Ms. Raiford alleged that by hiring Dickerson, Defendants discriminated against Ms. Raiford on the basis of age. She later amended the charge to add race discrimination. Although she testified at her deposition that the hiring of Dickerson was race discrimination, she asserted in her Affidavit that the hiring of Dickerson was age discrimination. (Pl. Aff. ¶¶ 71-73.)

[32] Defendants focus their argument on Michelle Cosby, an African-American, who, since Ms. Raiford's termination, has been performing the duties assigned to Ms. Raiford when she was Head of Reference Services. (Doc. #50 at 19.) However, when asked about Cosby during her deposition, Ms. Raiford stated that Cosby's purported replacement as Head of Reference Services was age discrimination, not race discrimination, consistent with the allegations in her Complaint. (Pl. Dep. 125:18-126:3; Amended Compl. ¶ 108.)

responsibilities and the new working title of Head of Reference Services. (See, e.g., Pl.'s Aff. ¶ 32 ("On July 21, 2010, Lauren Collins and Nichelle Perry called me to their office and offered me a promotion to Head of Reference Services which I accepted because of the expanded career potential.").) Her position number as Head of Reference Services remained the same as it was when she was Student Services/Reference Librarian, position number 1178. (Compare Doc. #49 Exs. 3 & 4 with Doc. #49 Ex. 10.) Dickerson, on the other hand, was hired as an entry-level Student Services Reference Librarian to fill a Reference Librarian position left vacant by the resignation of another employee, Jillian Williams. (Collins Aff. ¶ 14.) Furthermore, not only did Dickerson not replace Ms. Raiford, but Ms. Raiford participated in and supported the hiring of Dickerson. (Id.)

Ms. Raiford also alleges that she was treated less favorably than Dickerson and DeWitt, two Caucasians purportedly similarly situated to Ms. Raiford "in the areas [of] collaboration, failure to communicate in a timely manner" who were not reprimanded. (Pl. Dep. 122:7-8, 122:12-16, 122:24-123:19, 127:7-131:14; see also Pl.'s Supp. Resp. & Objs. To Defs.' First Interrogs. Nos. 4, 5.) Ms. Raiford's alleged evidence of Dickerson's and DeWitt's failure to communicate timely and collaborate does not establish

41

that Dickerson or DeWitt were similarly situated in any way, other than their official titles of Reference Librarians, to Ms. Raiford.

Finally, the individual defendants are African-American (Pierce Aff. ¶ 15; Collins Aff. ¶ 62; Perry Aff. ¶ 66), as is Ms. Raiford (Pl. Dep. 9:12-13). While this fact is not dispositive, it can be "circumstantial evidence against . . . discrimination." McNeal v. Montgomery Cnty., 307 F. App'x 766, 775 (unpublished) (in the age discrimination context). See also, e.g., Parker v. Magna Innertech-Spartanburg, No. 6:09-773-JMC-KFM, 2010 WL 5488599, *8 (D.S.C Nov. 29, 2010) (finding a "particularly strong" "inference that race is not a factor" in termination where plaintiff and decision-maker were not only the same race, but decision-maker had earlier hired plaintiff); Wilder v. Columbia Fire Dep't, No. 3:07-976-CMC-BM, 2008 WL 3010084, *6 (D.S.C. July 31, 2008) (citing Rhodes v. Guiberson Oil Tools, 75 F. 3d 989, 1002 (5th Cir. 1996) for "finding that a decision-maker who was the same race as the plaintiff considerably undermined the probability that race was a factor").

To the extent that paragraph 143 of the Amended Complaint alleges a racially hostile work environment (e.g., "subjected to heightened scrutiny, increase surveillance, exclusion and isolation, . . . threats"), Ms. Raiford's claim also fails. Even if one were to assume that her descriptions of the

42

individual defendants' alleged actions are accurate, there is no evidence to suggest that any of their actions, particularly when examining the totality of the circumstances, were based on race. See Spriggs v. Diamond Auto Glass, 242 F.3d 179, 183-84 (4th Cir. 2001) (providing elements for racially hostile work environment – harassment was unwelcome, based on race, and sufficiently severe or pervasive to alter the conditions of employment and create an abusive atmosphere).

There simply is no evidence to support a finding that any of the individual defendants' decisions about Ms. Raiford were made under circumstances which, more likely than not, were based upon impermissible racial considerations.  Ms. Raiford has not met her burden of establishing a prima facie case of status-based race discrimination in violation of § 1983.

## 2.

There is some indication in Ms. Raiford's Reply Brief (Doc. #56) that she not only asserts as part of her § 1983 claim status-based discrimination, but also retaliation. (See, e.g., id. at 12.)  Her reliance on CBOCS W., Inc. v. Humphries, 553 U.S. 442, 457, 128 S. Ct. 1951, 1961 (2008) in support of a retaliation claim pursuant to 42 U.S.C. § 1981 is misplaced.  Unlike Humphries, Ms. Raiford sued state actors.  Consequently, § 1983 is her exclusive federal remedy for violations of § 1981. Jett, 491 U.S. at 733, 109

43

S. Ct. at 2722.  Therefore, although "§ 1981 encompasses claims of retaliation[,]" Humphries, 553 U.S. at 457, 128 S. Ct. at 1961, Ms. Raiford cannot avail herself of such protection.  Not only is § 1983 her exclusive remedy, but she brought her claim specifically under the Equal Protection Clause of the Fourteenth Amendment.  "'A pure or generic retaliation claim . . . simply does not implicate the Equal Protection Clause.'" Edwards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir. 1999) (quoting Watkins v. Bowden, 105 F.3d 1344, 1354 (11th Cir. 1997) citing other cases from the Second, Seventh, Tenth, and Eleventh Circuits).  Ms. Raiford's claim of retaliation in violation of § 1983 for having participated in protected activity could have been brought as a First Amendment claim. See, e.g., id.  But, this Court will not construe her purported retaliation claim as one alleging a violation of the First Amendment.  She has not pled a First Amendment claim, cited any authority in support of having made a First Amendment claim, or argued that she alleged a First Amendment claim. See, e.g., Love-Lane v. Martin, 355 F.3d 766, 776 (4th Cir. 2004) (explaining and analyzing First Amendment claim brought pursuant to § 1983).

Because Ms. Raiford has failed to establish a violation of § 1983 based on her race and cannot pursue a retaliation claim under the Equal

Protection Clause, Defendants' motion for summary judgment on Ms. Raiford's § 1983 claim is granted.

## IV.

Next, Ms. Raiford has moved to file a Surreply to Defendants' Motion for Summary Judgment. The Local Rules do not permit the non-moving party to submit a surreply brief unless the moving party raises an evidentiary objection in its reply brief. See L.R. 7.3 & L.R. 7.6. In this case, it is not apparent that Defendants asserted an evidentiary objection in their reply brief. Instead, Defendants used their Reply Brief to do what they are instructed to do – "limit[] [their Reply Brief] to discussion of matters newly raised in the response." L.R. 7.3(h). Therefore, Plaintiff's Motion to File Surreply is denied.

## V.

Finally, Ms. Raiford has filed her own motion for partial summary judgment on NCCU's Faragher/Ellerth affirmative defense and the issue of retaliation by failing to investigate any of her EEOC charges other than the first. (Doc. #51.)

Ms. Raiford alleges retaliatory harassment both in her fourth charge with the EEOC ("I have been subjected to a hostile work environment . . . .") and in her Amended Complaint (e.g., referring to "management's

45

harassment"). (Doc. #9 e.g., ¶¶ 79, 111 & Ex. E.)  However, as discussed

above in Section III.A.2.b., it was determined that the evidence does not

support a claim of retaliatory harassment.  Therefore, the portion of Ms.

Raiford's motion in which she seeks summary judgment on NCCU's

Faragher/Ellerth defense[33] is moot. Cf. Burlington Indus., Inc. v. Ellerth, 524

U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998) and Faragher v. City of Boca

Raton, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93 (1998) (both holding

that "[a]n employer is subject to vicarious liability . . . for an actionable

hostile environment" but may assert an affirmative defense).

　　　With respect to the portion of Ms. Raiford's motion concerning

investigation of her subsequent EEOC charges, she cites no authority of a

duty owed to her for NCCU to investigate charges made to the EEOC nor

that a failure to investigate would constitute evidence supporting proof of

whatever discrimination was alleged in the charges.  Nevertheless, there is

no evidence suggesting that NCCU denied Plaintiff access to its internal

investigative process or otherwise retaliated against her by failing to

---

[33] The parties assume that NCCU has asserted the Faragher/Ellerth defense,
although they differ as to the source of the assertion.  Ms. Raiford believes NCCU
asserted the Faragher/Ellerth defense in Defendants' response brief in opposition to
Ms. Raiford's motion to compel (Doc. #37). (Doc. #52 at 2.)  NCCU does not
disagree, but contends that its Fifth Defense includes the Faragher/Ellerth defense,
and Ms. Raiford does not dispute this. (Docs. #62 at 4, #64.)

46

investigate her EEOC charges.  Therefore, summary judgment on this issue is not appropriate.

VI.

For the reasons stated herein, Plaintiff's Motion for Leave to Amend the Complaint (Doc. #39) is **DENIED**, Defendants' Motion for Summary Judgment (Doc. #49) is **GRANTED IN PART AND DENIED IN PART**, Plaintiff's Motion for Leave to File Surreply to Defendants' Motion for Summary Judgment (Doc. #65) is **DENIED**, and Plaintiff's Motion for Partial Summary Judgment (Doc. #51) is **DENIED**.

This the 19th day of June, 2015.


/s/ N. Carlton Tilley, Jr.<br>Senior United States District Judge